## Dunn *versus* Olney.

1. Where A has the earliest judgments against a debtor, who was owner of two separate properties, the one in town, the other in the country, and B obtains a subsequent judgment against the same debtor; two persons desiring to purchase the town property, agree with A, that if he will release the same from the lien of his judgments, a judgment which A was to take from the debtor, in lieu of his two former judgments, should be the first lien on the country property. If on the sale of the country property, the judgment of B be taken out of the proceeds, A has a right to subrogation to the judgment of B as to the *town property*, as against the purchasers, who made the agreement, and to whom and others it was conveyed by the debtor, after the said agreement. He is not obliged to resort to his personal covenant with them.

2. That A has purchased the country property at the sheriff's sale, and sold it at an advance, will not affect his right of subrogation.

ERROR to the Common Pleas of *Erie county*.

Judgment was rendered on a case stated. Simeon Dunn owned two properties, one a brick house and lot in Erie, the other a tavern house and lot of ground in Eagle village, Mill Creek township, Erie county. Reed had two judgments against him, which were *the first liens* on the said property. Olney afterwards obtained a judgment against Dunn, entered on the 2d day of March, 1838. On the 4th June, 1839, Dunn sold and conveyed the house and lot in Erie to Lytle, Law, Judd, and Miller, and they paid him the purchase money. Afterwards an agreement, as follows, was made:

### *Agreement between Lytle and Law, and Reed.*

We, James Lytle and John Law, do hereby covenant and agree to and with Charles M. Reed, for and in consideration of the said Reed releasing the liens of two certain judgments he holds against Simeon Dunn, upon a certain brick house and lot in the borough of Erie, sold lately by the said Dunn to the said Lytle, Law, and Arvin Miller, to keep and save harmless the said Charles M. Reed from the judgment liens upon the real property of Simeon Dunn, in Eagle village, and is the same property where the said Dunn now lives, the said Reed having this day taken a judgment against the said Simeon Dunn, and we do agree to make it the same as if it were the first lien upon the said Eagle village property.

In witness whereof, we have hereunto set our hands and seals, this 29th day of June, 1839.　　　JAMES LYTLE, [L. S.]
　　　　　　　　　　　　　　　　　　　JOHN LAW, [L. S.]

In October, 1842, a *sci. fa.* issued to revive the Olney judgment, with notice to the purchasers of the property in Erie.

In November, 1842, judgment.

On the 5th June, 1839, a judgment was entered in favor of Reed *v.* Dunn, for $523.26. This judgment was to be in lieu of Reed's

[Dunn *v.* Olney.]

two former judgments. This judgment was revived in 1842. A *fi. fa.* was issued on the judgment of Reed, and a levy made on the tavern property; it was valued at $2500. It was sold on *venditioni exponas* on Reed's judgment, and in February, 1845, was purchased by Reed for $560. The amount due on the Olney judgment was taken out of the proceeds of the sheriff's sale. Reed afterwards sold the property for one thousand dollars.

In October, 1847, a *sci. fa.* was issued for the use of Reed, on the Olney judgment, against Dunn, with notice to Miller, Judd, Lytle, and Law, terre tenants, Reed claiming a right of subrogation as to that judgment, as to the house and lot in Erie. *Sci. fa.* not served as to Judd. The terre tenants served, objected.

A case was stated, and on April 29th, 1850, the court directed judgment to be entered for plaintiff (Reed) against terre tenants, Lytle and Law.

It was assigned for error, that the court erred in entering judgment on the case stated, in favor of the plaintiffs.

The case was argued by *Marshall*, for plaintiffs in error.

*Selden*, for defendant in error, (Reed.)

The opinion of the court was delivered, Oct. 9th, by

BELL, J.—The written opinion which accompanies the record, indicates the judgment rendered by the Common Pleas to have been the result of an impression that the case presented is the ordinary one of two creditors of the same debtor, the owner of two funds, to both of which one of the creditors may have recourse for payment, while the means of satisfaction of the other creditor is confined to one of the funds. As we have had, recently, frequent occasion to observe, in such a case a chancellor will, almost of course, compel the more fortunate claimant to look to that source of payment against which the other has no claim, if this be necessary to prevent the latter from being balked of his chance of satisfaction. The books abound with instances of this interference, or what is equivalent to it, the subrogation of the disappointed creditor to the legal position of the double creditor, who has availed himself of the fund which was alone liable to respond to the call of the single creditor. But this is not the case before us, though at first blush it would seem to be so. To ascertain who are really the contestants, and their relative rights, we must regard the actual position of the parties, and treat the application for subrogation as though it were a prayer preferred to a chancellor to compel the first lien creditor to seek satisfaction from the premises purchased by the plaintiffs in error. Viewed in this aspect, the case is that propounded by Lord ELDON, in *ex parte* Kendall, 17 *Vesey* 514, of two creditors having demands against two distinct debtors, each

[Dunn *v.* Olney.]

of whom are equally liable to one of the creditors, while the claim of the other is against one of the debtors alone.

The *scire facias* under which the contest arises, though in form sued against the defendant in the judgment, is, in truth and legal effect, a proceeding against the plaintiffs in error.  The object is to compel them, as *terre tenants* of the land purchased, to make good to Reed, the separate lien creditor of Dunn, his loss occasioned by the application of the proceeds of the sheriff's sale of Dunn's land in discharge of Olney's judgment; that judgment having been, also, an encumbrance upon the land conveyed to the plaintiffs in error.  They are thus presented as debtors who, with Dunn, were jointly and severally liable to pay the judgment held by Olney, while Dunn was, alone, liable to Reed.  The application to be subrogated must, consequently, proceed on the ground that, a court of equity would have compelled Olney to levy his debt upon the premises conveyed to Lytle, Law, Miller, and Judd, in relief of the property retained by Dunn for the benefit of his separate creditor.  But, would equity so interpose?  It certainly would not; simply because, otherwise, Reed might lose his debt. In cases like this, considerations other than the safety of the several creditors are necessary to call into action the saving power of a chancellor.  These considerations are found in some right residing in the separate debtor himself, or in some other supervening equity, which points to his co-debtors as the parties who, rightfully, ought to discharge the encumbrance in aid of the distinct creditor.  This is so clearly pointed out by Lord ELDON, in the cases I have cited, when treating of the distinction which marks the relative liabilities of different classes of debtors, that I cannot, perhaps, better elucidate the subject than by extracting the passage.  "If," said he, "A. has a right to go upon two funds, and B. upon one, *having both the same debtor*, A. shall take payment from that fund to which he can resort exclusively; that, by these means of distribution, both shall be paid.  This course takes place where both are creditors of the same person, and have demands against funds, the property of the same person.  But, it was never said that, if I have a demand against A. and B., a creditor of B. shall compel me to go against A., without more; as if B. himself could insist that A. ought to pay in the first instance; as in the ordinary case of drawer and acceptor, or principal and surety; to the intent that all the allegations arising out of these complicated transactions may be satisfied: but if I have a demand against both, the creditors of B. have no right to compel me to seek payment from A., if not founded in some equity, *giving B. the right for his own sake to compel me to seek payment of A.*" The application of the principle here developed, has been illustrated by a statement of almost the very case before us.  It is put by STORY, in his *Treatise on Equity*, sec. 642, and was cited

T 2

[Dunn *v.* Olney.]

with approbation by Mr. Justice KENNEDY, in Ebenhardt's Appeal, 8 *W. & Ser.* 327. "Where parties, seeking the aid of the court, are not creditors of the same common debtor, they cannot claim to have the funds marshalled, in order to have a large dividend out of one fund for those who can claim only against that. For example, if a joint debt be due to one creditor by two persons, and a several debt be due by one of them to another creditor, and the joint creditor obtains a joint judgment against the joint debtors, and the several creditor obtains a subsequent judgment against his own several debtor; a court of equity will not compel the joint creditor to resort to the funds of one of the joint debtors, so as to leave the second judgment in full force against the funds of the other several debtor; unless, indeed, it should appear that the debt, though joint in form, ought to be paid by one of the debtors only, or there should be some other supervening equity." An examination of our judicial decisions will show that this doctrine has been closely observed by the courts of this country. Among these determinations, our own case of Neff *v.* Miller, 8 *Barr* 347, may be specially noticed, as an instance where the equity residing in a surety, the proceeds of whose lands had been applied in discharge of a joint judgment, was found sufficient to enable his separate creditor to lay hold on the joint judgment as a means of replacing a several fund, of which the interference of the joint encumbrancer had deprived him.

But what right has Dunn, as owner of the tavern house in Eagle village, or Reed, simply in his character of several lien creditor, to call upon the plaintiffs in error to replace the sum abstracted by the owner of Olney's judgment? None whatever. On the contrary, following the lead of the courts of New York, it was ruled in Stanley *v.* Nailor, 10 *Ser. & R.* 450, and finally settled in Cowden's Estate, 1 *Barr* 267, as the rule in Pennsylvania, that if one of several estates, encumbered by a joint lien, be aliened by the debtor, the estate still remaining in him is, in equity, first liable to discharge the encumbrance, and a subsequent purchaser will take it *cum onere.* "If," said Chancellor KENT, in Clowes *v.* Dickinson, 4 *Johns. Ch. R.* 17, "there be several purchasers in succession, at different times, I apprehend that in that case, there is no equality, and no contribution as between purchasers. Thus, for instance, if there be a judgment against a person owning, at the time, three acres of land, and he sells one acre to A., the remaining two acres are first chargeable, in equity, with the payment of the judgment debt, as we have already seen, and that too, whether the land be in the hands of the debtor himself or of his heirs. If he sells another acre to B., the remaining acre is then chargeable, in the first instance, with the debt against B., as well as against A.; and if it should prove insufficient, then the acre sold to B. ought to supply the deficiency, in preference to the acre sold to

[Dunn *v.* Olney.]

A.; because, when B. purchased, he took his land charged with
the debt in the hands of the debtor, in preference to the land
already sold to A.   In this respect, we may say of him, as is said
of the heir; he sits in the seat of his grantor, and must take the
land with all its equitable burdens; it cannot be in the power of
the debtor, by the act of his assigning or selling his remaining
land, to throw the burden of the judgment, or a ratable part of
it, back upon A." In the preceding case of Gill *v.* Lyon, 1 *Johns.
Ch. R.* 440, this doctrine was applied to a mortgage.   There, a
mortgagor had sold part of the mortgaged premises to Lyon, and
the rest being sold under a subsequent judgment, it was held, that
the mortgage was first to be satisfied out of the land purchased
under the judgment, and that Lyon was not bound in equity to
bear any proportion of the mortgage debt, unless the residue of
the mortgaged premises should be insufficient to satisfy it.   And,
finally, in a very recent case in this court, a recognition of this
principle produced the determination, that a vendee, whose land is
taken in execution in discharge of a judgment recovered against
his vendor, is entitled to be substituted as against the remaining
land of the latter.   *In re* Gill, 6 *Barr* 504.

The unanswerable reasoning which gave birth to this rule, also
comprehends within its scope posterior encumbrancers whose liens
are, of necessity, subservient to the prior encumbrance.   They
are, in this particular, entitled to no greater rights than those pos-
sessed by their debtors; and, consequently, cannot pretend to any
superior equities.   On this ground Ebenhardt's Appeal was decided;
a decision which is unimpeachable, if the case be regarded as possess-
ing none but the ordinary features of lien, sale and the subsequent
recovery of judgments against the vendor.   But I am very strongly
impressed with the notion, that sufficient weight was not accorded,
by the majority of the court, to the undertaking of the vendee to
apply a portion of the purchase money, in payment of the first
encumbrance; a fact which, it seems to me, Mr. Justice SERGEANT
properly thought of sufficient efficacy to entitle the younger lien
creditors to be substituted as against the land first sold, *pro tanto.*

From the general rule ascertained by the authorities to which
reference has been made, it results that if, in our own case, the
attention be confined to the judgments and conveyances, the pre-
tensions of the junior encumbrancer are unsupported by even the
shadow of an equity.   Indeed, were chancery called upon to inter-
pose its authority, it could only be for the protection of the plain-
tiffs in error, as first purchasers, by compelling the elder lien
creditor to exhaust the value of the land last sold as the property
of Dunn, before calling upon the estate first aliened by him.   The
right to call for equitable interference would, in truth, reside in
the first alienees; and that interposition, uninfluenced by extra-
neous facts, must have ended by putting the parties in the position

[Dunn *v.* Olney.]

effected by the proceedings at law. Had the plaintiffs in error expressly purchased subject to Olney's judgment, by estimating its amount as part of the purchase-money, a different case would be presented. In that event, they must, in equity, have been regarded as the principal debtors, and, under the principle stated in Morris *v.* Oakford, the property held by Dunn, esteemed as a security merely, and entitled to the equity which a mere surety may challenge. It was asserted on the argument, and there is some reason to believe they did so purchase; but it is not so certainly ascertained by the record as to warrant us in founding a conclusion upon it. But luckily for the junior encumbrancer, the evidence ascertains a fact which, as between him and the plaintiffs in error, is, in our estimation, of equal value as the foundation of the peculiar equity he invokes. It is found in the agreement of the 29th June, 1839. At this time, Reed was the first encumbrancer. In consideration of his assent to release the lien of this encumbrance as against the property which Lytle and Law, with others, were then about to purchase from Dunn, and to accept in lieu of it a judgment to be entered against the remaining property of their grantor, they undertook to indemnify him against all prior liens upon the Eagle village property, and " to make it the same as if it (the younger judgment) were the first lien upon the said Eagle village property." Among the prior liens, thus guarded against, was Olney's judgment, or rather, I believe, it was the only prior lien, and made so by Reed's relinquishment of his first judgments, at the instance and for the accommodation of Lytle and Law. The object as well as the reason for their undertaking is obvious enough. In requital for the promotion of their interests, Reed was to be saved from all loss which might, by possibility, accrue from his relinquishment of the first place, to become a subordinate encumbrancer; and this was to be effected by substantially securing to him every advantage he could enjoy from the actual occupation of the leading position. But under the events that have occurred, full effect cannot be given to the arrangement without conceding to Reed the assistance he craves. There is no other mode by which Lytle and Law can secure to Reed's judgment the place of " first lien on the Eagle village property," or its equivalent. This they bound themselves to do; and, having failed, their neglect is creative of an equity in Reed, to have the benefit of the elder lien, so far as may be necessary for his reimbursement.

In answer to this claim, it will not do to say the undertaking of the plaintiffs in error is a personal covenant merely, for the breach of which the law furnishes an ample remedy. This may be wholly inadequate. The arrangement was made in anticipation of the intended purchase, and in reference to it. It is, therefore, to be construed in immediate connection with the circumstances in which it originated. So considered, it appears to me to admit of but one in-

[Dunn *v*. Olney.]

terpretation.   It is as if Lytle and Law had said to Reed, "If you will enable us to raise money to make the purchases by consenting to assume a place as lien creditor, subordinate to Olney's judgment, we will, if necessary, insure the safety of your interests by foregoing our equity, as first purchasers, to have that judgment satisfied out of the Eagle village property, and will thus, so far as we can, make your judgment the same as if it were the first lien" on that property.   Such a stipulation cannot be less adequate to originate a right of substitution than an agreement to buy, subject to the lien, which, beyond question, would have conferred on the younger creditor the equity of subrogation.   In the face of such a stipulation, it will not do to turn the party round upon what may prove to be insufficient for his safety—a merely personal covenant. But merely personal covenants frequently furnish ground upon which to found this peculiar equity.   Champlin *v*. Williams, 9 *Barr* 341, and Morris *v*. Oakford, *id*. 499, are, among numerous others, instances of this; and neither of them presents stronger reasons than are to be found in the arrangement before us.   The remedy must, however, be limited to such estates as Law and Lytle have in the house and lot in the town of Erie.   As they alone covenanted with Reed, the remedy springing from the covenant cannot be made effective beyond their respective interests in the subject of the lien, the aid of which is sought; and the court below, in awarding judgment, went not beyond these interests.

It will be observed, the question is treated as solely pending between the plaintiffs and the defendant in error, and without reference to lien creditors of the former.   The record makes no mention of such creditors, and it is presumed there are none whose rights are involved in the contest.   Were it otherwise, notice of the agreement would seem to be necessary to involve them in its equitable consequences.   But upon this point we are not called to express an opinion.

The fact that Reed afterwards sold the Eagle village property at an advance upon the price paid by him, can have no effect to vary the right vested in him before the sale made by him.   Had he sold with a loss, that circumstance would not have added to the amount he is now entitled to call for from the plaintiffs in error; nor ought the contrary fact affect him adversely.   These consequences were contingencies subject to which he took the land, but with which the plaintiffs in error have no connection.   Besides, for all that appears, he may hereafter lose the whole benefit of his sale, upon some one of the common covenants of his conveyance.

Judgment affirmed.